(118 N. W. 242.)

---

STATE OF NORTH DAKOTA, EX REL. THOMAS H. POOLE V. AMASA P. PEAKE.

Opinion filed March 6, 1909.

**Statutes — Expression of Subject in Title.**

1. Section 2, chapter 136, page 244, Laws 1905, providing that no appointment to any of the departmental offices of the state militia shall be for a longer period than two years, is germane to the subject and general purpose expressed in the title, "An act providing that all appointments to the various departments of the National Guard of the state of North Dakota shall be made from officers of the field and line," and does not contravene the provision of section 61, article 2, of the state constitution, requiring that the subject of an act shall be exprssed in the title. (Morgan, C. J., and Fisk, J., dissenting.)

**Same.**

2. In determining the constitutionality of a legislative act under section 61, article 2, of the state constitution, the title of the act is to be construed in the light of the general object and purpose of the act; and if, so construed, the provisions of the act appear to be in furtherance of the general purpose expressed in the title, the act will be upheld.

Original application by the State, on relation of Thomas H. Poole, for a writ of quo warranto to be directed to Amasa P. Peake. Application for writ denied, and alternative writ quashed.

*Ball, Watson, Young & Lawrence,* and *Engerud, Holt & Frame,* for relator. *Andrew Miller, Atty. Gen.,* and *M. A. Hildreth,* for respondent.

ELLSWORTH, J. This is an original proceeding, before this court, arising out of an information in the nature of quo warranto, presented by the State, on the relation of Thomas H. Poole, against Amasa P. Peake. Those allegations of the information that, in

the view of the majority of the court, are material and controlling, are to the effect that on January 7, 1907, E. Y. Sarles, then Governor of the state of North Dakota, appointed the relator to the office of Adjutant General of said state, and issued to him a commission wherein he was designated as Adjutant General of the state of North Dakota with the rank of brigadier general; that relator accepted said appointment and commission, and immediately thereafter, on the same day, qualified by taking the oath of office and giving the bond required by law, and at all times since has acted as the Adjutant General of the state of North Dakota, and has not been removed from such office by the sentence or judgment of a court martial.

The information then sets out, at length, certain orders made on January 7, 1909, by John Burke, the successor in office, as Governor of North Dakota, of E. Y. Sarles, by whom relator's appointment was made. The evident purpose and intent of these orders was to relieve relator from further service as Adjutant General, and from further active duty as an officer of the state militia, and to place him on the retired list of the North Dakota National Guard. Relator, so the information recites, protested against the authority of the Governor to make these orders, and refused to obey any of them or in any manner to recognize the validity thereof. Thereupon, on January 12, 1909, Governor Burke issued to the respondent, Amasa P. Peake, a commission as Adjutant General of the state of North Dakota, with the rank of brigadier general, such appointment to date from January 7, 1909; and said Peake claiming the right, pursuant to such appointment and commission, to exercise the functions and powers of the office of Adjutant General, has intruded into said office and is interfering with and to a great extent preventing relator from properly discharging the duties of said office, to the great detriment of the public service, the disturbance of peace and good order, and the great prejudice of military discipline.

Relator's information, with the consent of the Attorney General that he might initiate the proceeding in the name of the state, was filed in this court, and a writ issued and directed to the respondent, Peake, requiring him to appear before this court and answer the information and make full disclosure of his right to intrude into and exercise the powers and duties of Adjutant General of this state and to exclude the relator therefrom.

In response to the mandate of the writ, respondent appeared and presented an answer in which, at considerable length, he traverses some parts of relator's information and admits others. He alleges many facts in explanation and justification of the course of Governor Burke in making the orders dated January 7, 1909, but the only part of respondent's return that bears with material force on the points controlling the decision of the case are the allegations to the effect that on the 12th day of January, 1909, Governor Burke, pursuant to and by virtue of sections 1720 and 1721, Rev. Codes 1905, appointed and commissioned the respondent as Adjutant General of North Dakota for a term of two years, ending January 7, 1911; and that, "pursuant to the said appointment and commission, respondent accepted said appointment and commission, and has filed his bond and in all other respects qualified in the manner and form prescribed by law, and has entered upon and assumed the duties of said office by virtue of said appointment and commission, and now is the duly appointed, commissioned, qualified and acting Adjutant General of North Dakota."

Upon the information as presented and the return of respondent thereto, a hearing before this court was had, in which relator and respondent appeared by counsel, and an elaborate argument of the issues arising in the proceeding was had. No denial of the allegation last quoted from respondent's return was made by relator. It was, in fact, admitted that appointments had been made by Governor Sarles and Governor Burke at the times and in the manner alleged in the moving papers; and that the only material issue presented by the proceedings is that of the right to the office of Adjutant General under the respective claims of the relator, Poole, and respondent, Peake.

The jurisdiction acquired under information in the nature of quo warranto has been most frequently exercised by the courts of the United States for the purpose of determining disputed questions of title to public office, and for deciding upon the proper person to hold the office and exercise its functions. High's Extraordinary Remedies, § 623. The point being, therefore, fairly and definitely presented in a proper proceeding, it remains only for this court to determine which of the contending parties is entitled to the office, and, if it then appears that a usurper has intruded into and is holding the office, to exclude him therefrom.

The Adjutant General's department in the state militia, to consist of one Adjutant General with the rank of brigadier general, was first provided for by the territorial law of 1887. Chapter 100, p. 258, Laws 1887. This statute was re-enacted by the State Legislature in 1891, and the right of appointment of the Adjutant General vested in the Governor. Chapter 86, p. 229, Laws of 1891. The term of office is not fixed or defined by this act. In accordance with a limitation of the state Constitution, the act provides that "all commissions shall be issued by the Governor and no commissioned officer shall be removed from office except by sentence of a court-martial."

The law of 1891, so far as it related to the Adjutant General's department, remained unaltered until 1905, when the legislative act was passed, entitled "An act providing that all appointments to the various departments of the National Guard of the state of North Dakota shall be made from officers of the field or line." This act, so far as its provisions are material or in point, is in words as follows: "Whenever a vacancy shall occur in any of the departments of the National Guard of the state of North Dakota, to wit: the Adjutant General's department, the supply department, the engineer and ordnance department, or Judge Advocate and Inspector General's department, an officer shall be appointed and promoted thereto from the officers of the field or line of the National Guard of the state of North Dakota. No appointment to any department office shall be for a longer period than two years." Chapter 136, p. 244, Laws 1905.

This act, if constitutional and valid, was in full force on January 7, 1907, at the time of relator's appointment by Governor Sarles to the office of Adjutant General. The Legislative Assembly is expressly authorized by the Constitution to provide the manner of appointment or election of all militia officers, and there seems to be no question but that this includes the right to fix a stated term of office. As the act of 1905 prescribes a maximum term of two years for appointments to the office of Adjutant General, relator's term expired on January 7, 1909, and on the appointment and qualification of the respondent, Peake, as his successor on January 12, 1909, his right to exercise the functions of the office fully terminated. Even assuming that relator was a "commissioned officer" within the meaning of section 192 of the state Constitution, a point which it is unnecessary in our view of the case to decide,

the inhibition there set forth against removal from office can have no application to an officer who attempts to retain his office after the expiration of his term.

Relator strenuously contends, however, that that portion of chapter 136, p. 244, Laws 1905, which expresses a purpose to fix a term of office, is in conflict with section 61 of the state Constitution, in that the subject of term of office is not expressed in the title of the act, and is, therefore, invalid and void. If this contention is sound, it follows that there is no term fixed for the office of Adjutant General, and that the decision of this case depends upon other and different considerations. On the other hand, if it appears upon examination that the act is not vulnerable to the constitutional objection urged against it, it is very clear that relator's official term expired before respondent asserted his claim to the office, and that it is not necessary to look further in order to reach a determination of the only issue arising out of this proceeding.

The question of the unconstitutionality of legislative acts by reason of the fact that the purpose or subject of the act is not expressed in the title has been before this court in a number of cases. In 1907 certain rules or principles govering the construction of section 61 of the state Constitution were formulated by this court in the case of Powers Elevator Company v. Pottner, 16 N. D. 359, 113 N. W. 703. In the later case of State v. Burr, 16 N. D. 581, 113 N. W. 705, these principles were further elaborated, and, as announced in these cases, have become a rule of construction on which the bar and parties generally in any manner affected by the operation of this constitutional provision are entitled to rely. A rule of construction so announced, and acted upon for such length of time that it may be said to be fairly settled, should not now be altered or lightly considered unless, in the view of the court as at present constituted, it is opposed to sound principle or better reason. These rules, while a decided innovation upon the principles of construction followed in the earlier cases decided by this court, proceed upon a broad and liberal policy, and are supported by the great mass of later authority. They should, therefore, be applied to the determination of the point presented by this proceeding.

Accordingly, the principles that will be followed as guides in the construction of section 61 of the state Constitution are as follows: (1) The law will not be declared unconstitutional on account of the defect pointed out in the title, unless it is clearly so. (2) The title

will be liberally construed, and not in a strict or technical manner. (3) If the provisions of the act are germane to the expressions of the title, the law will be upheld. (4) Conflict with the constitutional provision must be clear and palpable, and, in case of doubt as to whether the subject is expressed in the title, the law will be upheld.

These rules of construction apply to all legislative acts without distinction. Relator contends that the title to chapter 136, p. 244, Laws 1905, is a restrictive title, in that by its terms it limits appointment to the various departmental offices of the state militia to officers from the field and line, and that, when a purpose to limit or restrict is thus expressed in the title, the rule requiring liberal construction does not apply. It is true that when the evident purpose of a legislative act is restrictive its provisions are, as a rule, strictly construed. To extend this rule of construction from the body to the title of the act is, however, an apparent misapplication of a proper rule. For the purpose of determining the constitutionality of an act under section 61, no classification of titles has the countenance of any standard authority; and all titles, whether provisions of the act are general, specific, remedial, or restrictive, are alike to be liberally and not technically construed.

Under a broad and liberal construction, the words of the title, "appointments to the various departments of the National Guard of the state of North Dakota," express a purpose to prescribe a term of official service. The context indicates that the word "appointments" is used in the sense of designation to or selection for public office. With this signification the word is used not only as meaning the office or service to which one is appointed, but "as denoting the right or privilege conferred by an appointment." Bouvier's Law Dict. As the very essence of the right and privilege conferred by an appointment to public office consists in its duration, or, in other words, its term or tenure, it follows that the subject of term of office is fairly included in a broad signification of the word "appointment." A person reading a title in which the words, "appointment to public office," are used, will be apprised of and will naturally look for provisions of the act defining and regulating the term of office.

Further than this, the subject, term of office, is not, in any sense, foreign to or independent of the purpose expressed by the title of the act. On the other hand, the subjects, appointment and term,

when both considered in connection with public office, are so intimately related that the mind automatically reverts from one to the other. Therefore, those provisions of the act having reference to the term of office, whether or not arising by necessary implication from the expressions of the title, are so closely related or germane to it as to fall within the third principle of our rule of construction.

The title should be construed in the light of the evident object and purpose of the act. Any provision of the act which operates to further the general purpose expressed in the title will be held to be germane to it. There is an apparent general purpose throughout this act to limit the extent of the Governor's right of appointment to the departmental offices of the state militia. Prior to the passage of this act, he had full power of appointment, and might select his appointees from any department of the North Dakota National Guard; and the term of office was indefinite, and might extend over a period of many years. By the terms of the act, his range of selection is restricted to officers of the field and line, and, in furtherance of the same general purpose, it is provided that no appointment to any departmental office shall be for a longer period than two years. If the act, instead of being divided into two or three sections, had been expressed in a single paragraph, with section 2 attached as a proviso, in the words, "provided, however, that no appointment to any departmental office shall be for a longer period than two years," it is improbable that any serious question would be raised that the subject of term of office is not germane to the expressions of the title. The provision of section 2 of the act would then appear in its true relation to the other parts; that is, as a further limitation upon the Governor's power of appointment. Yet the meaning of section 2 is unaltered, and its legal effect wholly unchanged, by attaching it as a proviso to section 1 in the construction suggested.

The object and purpose of a provision such as that contained in section 61, art. 2, of our Constitution, is to advise the Legislature and public of the substance of proposed laws in advance of their passage, and thus prevent surprise, fraud, and the enactment of ill-considered legislation such as might result from grouping incongruous, foreign, and independent matters under one title. The purpose of such a provision is salutary; but we agree that that section of chapter 136, Laws 1905, prescribing a term of office, is

not violative of or in palpable conflict with the terms or purpose of the provision. It is sufficient if the title, either by express words or by necessary or reasonable implication from the meaning of its terms, includes the subject and purposes of the act, and this, under the rule of construction adopted for our guidance, we believe it does. That such construction is not forced, strained, or in any sense peculiar to this court appears by reference to the following citations: State v. Cassidy, 22 Minn. 312, 21 Am. Rep. 765; Boyle v. Vanderhoof, 45 Minn. 31, 47 N. W. 396; Gaines v. Williams, 146 Ill. 450, 34 N. E. 934; Diana Shooting Club v. Lamoreaux, 114 Wis, 44, 89 N. W. 880, 91 Am. St. Rep. 898.

As it appears upon a full showing that the respondent, Amasa P. Peake, is not only entitled to the office of Adjutant General, but is in full possession thereof, an order will be made denying the application of relator for a writ of quo warranto excluding respondent therefrom.

Writ denied.

CARMODY, J. concurs.

SPALDING, J. (concurring). While I concur with my associates, Judges ELLSWORTH and CARMODY, in holding the second section of chapter 136, p. 244, Laws 1905, not invalidated by any defect in the title of such act, I am of the opinion that other grounds should be given for denying the writ.

It is a well-established rule that courts will not pass upon the constitutionality of a statute when not necessary to the decision of the question under consideration. If my view of the law is correct, there is ample ground for denying the writ for other reasons than those given by my associates, and I shall as briefly as possible state such grounds and my views regarding the same.

Section 192 of the Constitution reads: "The commissioned officers of the militia shall be commisisoned by the Governor, and no commisisoned officer shall be removed from office except by sentence of court-martial pursuant to law." Our Constitution, including this section, was adopted and has been in force since 1889. In 1866 Congress enacted a law providing that: "No officer in the military or naval service shall, in time of peace, be dismissed from service except upon and in pursuance of the sentence of a court-martial to that effect, or in commutation thereof." Act July 13, 1866, c. 176,

§ 5, 14 Stat. 92. In my opinion there is no doubt that the convention which framed the Constitution of this state copied section 192 from the federal statute referred to, which had then been construed by the Supreme Court of the United States. It is to be presumed that in doing so the convention adopted the construction placed upon the statute by that court. But even if adopted in ignorance of that construction, or in disregard of it, it should still have very great weight with this court in determining the effect of section 192.

The statute in question was before the Supreme Court of the United States in 1881, and that court, by unanimous opinion announced by Judge Harlan, held that the appointing power still retained the right and power to remove a post chaplain in the army of the United States, and that the only effect of the statute quoted was to change the power of removal, which prior to its enactment had been exercised by the President alone, to the President and the Senate, and that it was not intended to abrogate the well-established and uniform rule that the power to remove is incident to the power to appoint. One Gilmore had been appointed by the President to the office held by Blake as post chaplain, and the appointment confirmed by the Senate, thus superseding Blake, and it was held that the latter ceased to be an officer in the army from and after the date at which that appointment took effect. This case was followed by Keyes v. United States, 109, U. S. 336, 3 Sup. Ct. 202, 27 L. Ed. 954, wherein it was held that the appointment, by and with the advice and consent of the Senate, of one Goldman in the place of Keyes, as second lieutenant in the army, was not prohibited by the statute referred to, and that it did not restrict the power of the President, by and with the advice and consent of the Senate—in other words, the appointing power—to displace officers of the army and navy by the appointment of others in their places. The latter decision was rendered in 1883. These two cases have been recognized as authorities on this question by that high tribunal repeatedly since 1880. The same construction of the statute was followed in Crenshaw v. United States, 134 U. S. 99, 10 Sup. Ct. 431, 33 L. Ed. 825, wherein it was held that an officer of the navy appointed for a definite term, or during good behavior, has no vested interest or contract right of which Congress cannot deprive him; that an officer, whatever the form of the statute, does not hold by contract, but enjoys a privilege revocable by the sovereignty at will. And

in Mullan v. United States, 140 U. S. 240, 11 Sup. Ct. 788, 35 L. Ed. 489, it was held that, notwithstanding the same statute, the President, with the advice and consent of the Senate, could supersede an officer in the military or naval service by the appointment of some one in his place. The office under consideration in that case was commander in the United States navy. These authorities were followed in Quackenbush v. United States, 177 U. S. 20, 20 Sup. Ct. 536, 44 L. Ed. 654, and it is held with practical uniformity that it requires the plainest language in the statute or the Constitution to fix a life tenure of office.

We have in this country no orders of nobility, and life tenure is repugnant to the spirit of our institutions. It matters not whether the office is civil or military, and no construction should be given section 192 of the Constitution which will effect a life tenure in any office, if it can be avoided on any reasonable grounds. It is conceded that the Legislature may limit the term of the office of Adjutant General, but would not the Legislature, in doing so, be providing for the removal of any incumbent quite as effectively as I contend can now be done by the Governor, who in this state is the sole appointing power? If section 192 is intended to be universal in its application, it must apply with as great force to the Legislature, which has no part of the appointing power incident to this office, as it does to the Governor. Is it not much more reasonable to assume that the section referred to was intended to prohibit only the removal of such officers by any power outside the appointing power, namely, by the Legislature or by the courts, than to contend that by the terms of the Constitution a departure was intended, and that a very radical one, from the whole tenor of our system of government and the spirit of republican institutions?

The Supreme Court of the United States has passed upon many analogous questions. In Shurtleff v. United States, 189 U. S. 311 23 Sup. Ct. 535, 47 L. Ed. 828, it made some observations pertinent to this subject. A federal statute provided for the appointment by the President, by and with the advice and consent of the Senate, of general appraisers of merchandise, and that they could be removed from office for certain causes. President McKinley removed one of the appraisers without assigning any cause, and without notice, as required by the statute. In holding that the President had this power of removal, the Supreme Court said: "It cannot

be doubted that, in the absence of constitutional or statutory provision, the President can, by virtue of his general power of appointment, remove an officer, even though appointed by and with the advice and consent of the Senate." Ex parte Hennen, 13 Pet. 230, 10 L. Ed. 138; Parsons v. United States, 167 U. S. 324, 17 Sup. Ct. 880, 42 L. Ed. 185, and cases cited. To take away this power of removal, in relation to an inferior office created by statute, although that statute provided for an appointment thereto by the President and confirmation by the Senate, would require very clear and explicit language. It should not be held to be taken away by mere inference or implication. Congress had regarded the office as of sufficient importance to make it proper to fill it by an appointment to be made by the President and confirmed by the Senate. It has therefore classed it as appropriately coming under the direct supervision of the President, and to be administered by officers appointed by him (and confirmed by the Senate), with reference to his constitutional responsibility to see that the laws are faithfully executed. Artcle 2, § 3.

In Blake v. United States, 103 U. S. 227, 26 L. Ed. 462, there were two constructions that might have been placed upon the act there under consideration, determining the tenure by which army and naval officers hold their commissions in time of peace, and the construction was placed on the fifth section of the act of July 13, 1866, c. 176 (14 Stat. 92) which left with the President his power to remove an officer of the army or navy by the appointment of his successor, by and with the advice and consent of the senate. Although this question was regarded as not free from difficulty, it was held that there was no intention on the part of Congress to deny or restrict the power of the President, with the consent of the Senate, to displace army and naval officers in time of peace by the appointment of others in their places. This indicates the tendency of the court to require explicit language to that effect before holding the power of the President to have been taken away by an act of Congress. The right to remove would exist if the statute had not contained a word on the subject. It does not exist by virtue of the grant, but it inheres in the right to appoint, unless limited by Constitution or statute. It requires plain language to take it away. Did Congress, by the use of language providing for removal for certain causes, thereby provide that the right could only be exercised in the specified causes? If so, see what a difference in the

tenure of office is effected as to this office from that existing generally in this country. The tenure of the judicial officers of the United States is provided for by the Constitution; but with that exception, no civil officer has ever held office by a life tenure since the foundation of the government. Even judges of the territorial courts may be removed by the President. McAllister v. United States, 141 U. S. 174, 11 Sup. Ct. 949, 35 L. Ed. 693. To construe the statute as contended for by the appellant is to give an appraiser of merchandise the right to hold that office during life, or until he can be found guilty of some act specified in the statute. If this be true, a complete revolution in the tenure of office is effected, by implication, with regard to this particular office. ·We think it quite inadmissible to attribute an intention on the part of Congress to make such an extraordinary change in the usual rule governing the tenure of office, and one which is to be applied to this particular office only, without stating such intention in plain and explicit language, instead of leaving it to be implied from doubtful inferences.

Fed. St. § 796, reads as follows: "District attorneys shall be appointed for the term of four years, and their commissions shall cease and expire at the expiration of four years from their respective dates, and every district attorney entering upon his office shall be sworn to the faithful execution thereof." In May, 1893, President Cleveland issued an order removing from office the attorney of the United States for the Northern and Middle Districts of Alabama, who had then served less than four years. That officer refused to surrender that office or the records thereof, or to recognize the power of the President to remove during the term of four years; and in Parsons v. United States, 167 U. S. 324, 17 Sup. Ct. 880, 42 L. Ed. 185, the Supreme Court, through Mr. Justice Peckham, passed upon the power of the President to remove, in the face of such statute and without assigning any cause, a district attorney from office before he had served four years, and held that he possessed such power.

The Militia Code makes the Adjutant General a member of the militia. I find no provision for the appointment of any military officer outside of the militia, hence I cannot agree with the very ingenious opinion of my Brother Fisk, but I can see that there are many reasons of great force why the Adjutant General should not have a life tenure which do not apply with equal weight to many other officers of the National Guard, and why the Governor should

have the power to remove him or to supersede him at pleasure. The duties of the Adjutant General are peculiar, and he in a sense bears a confidential relation to the Commander in Chief. It is through him that all orders are promulgated relating to the military service. He is presumed to be familiar with military law, usages, and regulations. Of necessity, the Governor must rely largely upon him for advice and support in the performance of his duty as Commander in Chief. It is essential that the incumbent be one who is willing to, and who does, act in harmony with the policies of his superior. Great confusion and disorganization would necessarily follow a lack of harmony between the two. With the power of appointment at all times in the hands of the executive, he is assured of the service of an officer upon whom he can rely. Without such power there is no such safeguard. The Commander in Chief may adopt policies not in conformity with the judgment of the Adjutant General. The latter may evade or disobey the requirements of his superior. He may do so in a manner which does not render him subject to court-martial, yet his acts, or his failure to act, may be wholly subversive of discipline in the service, and the Governor, on the theory of the relator, have no remedy and be compelled to submit to the dictates of a subordinate. The Legislature has recognized this situation by providing that the Governor shall have full power to appoint the Adjutant General. It is clear that it was meant by this that it should be unnecessary for the Senate to confirm the appointment, and that he can make the appointment whenever, in his judgment, the necessity or the good of the service requires it; and the power to make the appointment, as before indicated, carries with it, and cannot be fully exercised without, the power to supercede the incumbent. In addition to the authorities above indicated, some of which touch upon this point, see Keenan v. Perry, 24 Tex. 253; Throop on Public Officers, § 304; Mechem on Public Officers, § 445; Lewis et al. v. Lewelling, 53 Kan. 201, 36 Pac. 351, 23 L. R. A. 510.

These reasons seem to me sufficient to warrant this court in denying the writ without reference to the sufficiency of the title of the chapter cited. But in addition to these, I find another that seems worthy of consideration. If, as conceded by relator, it is competent for the Legislature to fix the term of office, and by so doing remove an incumbent, it must certainly be competent for the Governor to do so; he being the appointing power, rather than the

Legislature. Either of these contentions may be sustained by considering section 192 as though reading: "No commissioned officer shall be removed from office during his term except by sentence of court-martial pursuant to law." I am persuaded that, in the light of circumstances, usage, and all the other considerations referred to, it may bear such construction, and that, the Legislature not having fixed a definite term to the office, the incumbent holds at the pleasure of the appointing power. This construction, in the absence of legislative provision, in effect gives the Governor the power to fix the tenure of the office quite as fully and effectively as the Legislature may by an act providing a definite term. It also gives the effect to section 192 which may have been intended by its framers, namely, that if the Legislature does fix a term, and, in the absence of any act of the Governor superseding him when no term has been fixed by the Legislature, he may be removed from office in no other manner than by sentence of court-martial. In my judgment this latter construction is more consonant with the spirit of our institutions, with history, the usage of the service, the necessities which may often arrive, and with other considerations which apply more especially to this office than any other, and at the same time harmonizes with the construction of the federal statute given it by the federal authorities. Neither does it work any hardship to the officer, and promotes the efficiency of the service, and enables the Commander in Chief to maintain a staff in harmony with the policy of his administration of the military department.

FISK, J. (concurring specially). I concur in the conclusion that the writ should be denied, but am unable to assent to the reasons given by my associates for so holding, and will briefly state my views.

I am firmly convinced that sections 2 and 3, c. 136, p. 244, Laws 1905, are unconstitutional and void because not expressed in the title of the act. The title of the act is as follows: "An act providing that all appointments to the various departments of the National Guard of the state of North Dakota shall be made from officers of the field or line." By its restrictive language the subject-matter embraced in sections 2 and 3 cannot, under the most liberal construction, be said to be expressed in such title. Section 2 of the act prescribes a maximum period of two years for which appointments may be made, and section 3 provides for placing the

officers mentioned in section 1 upon the retired list at the end of their term of duty. These subjects are entirely foreign to the purpose of the act as expressed in the title, which is merely to restrict appointments to these various departments so that no one may be appointed except an officer of the field or line; in other words, it deals and purports to deal only with the question as to who may fill the various departments, and, as I construe the various decisions of this and other courts cited by my Brother ELLSWORTH, they come far short of sustaining his views.

The sections aforesaid being unconstitutional, there is no law prescribing the term of Adjutant General; but it by no means follows from this that his term is for life. On the contrary, it is clear to my mind, that his term of service is merely during the pleasure of the appointing power. There is good reason why this should be so, for the Adjutant General is a staff officer; he is a member of the official family of the Commander in Chief, and is referred to frequently as, and is by law in some states, Chief of Staff. He is, in a sense, the military secretary to the Commander in Chief. Under section 1719, Rev. Codes 1905, the Governor, as Commander in Chief, is given "full power to appoint the Adjutant General" and other departmental officers, and I think this fairly implies that he may do so at any time or at pleasure. If it was the intention that he should be empowered to make such appointments only when, by reason of removal through court-martial or by death a vacancy is created, different language would have been employed. It was no doubt the legislative understanding that appointments to these various departments were left entirely with the Governor as Commander in Chief. In other words, that he should have an absolutely free hand to remove and appoint at will any of such officers, as, in his judgment, the good of the militia demanded. This is in full accord with the general and well-established rule that the appointing power in the absence of express statute to the contrary fixing the term, may appoint and reappoint at will.

It is contended, however, by relator's counsel, in effect, that this general rule can have no application because of the provisions of section 192 of our state Constitution that "no commissioned officer shall be removed from office except by sentence of court-martial, pursuant to law." In my opinion, the fallacy of this argument consists in the unwarranted assumption that the persons appointed to these various departments become by virtue of such appointments "commissioned officers" within the meaning of such

constitutional provisions, and hence can be removed or retired only by court-martial. It is clear that such could not have been the intention of the framers of the Constitution. To attribute to them such purpose is to attribute to them a purpose to depart from the almost universally recognized custom, usage, and regulations pertaining to the militia in this country. By statute in Alabama, Arizona, California, Colorado, Connecticut, Georgia, Idaho, Illinois, Iowa, Kansas, Kentucky, Massachusetts, Montana, Missouri, Nebraska, Nevada, New York, North Carolina, Oregon, Utah and West Virginia, the Adjutant General is appointed by the Governor as Commander in Chief, and is a member of his staff, and holds his office during the pleasure of the Commander in Chief. In many of said states he is Chief of Staff. In some of them it is expressly provided that he cannot hold his office longer than the term of the Governor as Commander in Chief, or until his successor is appointed and qualified. In Arkansas the office of Adjutant General was abolished by act of March 11, 1879, and the duties formerly belonging to such office are given to the Governor's private secretary. In Florida he is Chief of Staff, and his term is four years, but he may be removed for certain causes. In Indiana he is a staff officer, and by statute it is provided that "no commissioned officer, except staff officer, shall be dismissed from the service except by the sentence of a legally constituted court-martial." In Michigan he is made a staff officer, and is appointed by the Governor, by and with the advice and consent of the Senate, for the period of two years, or until his successor is appointed and qualified. In Minnesota he is a member of the Governor's staff, and his term is not prescribed. In New Jersey he is appointed by the Governor, with the advice and consent of the Senate—no term fixed. In Rhode Island he is made Chief of Staff, and elected for a term of five years. In South Carolina he is a member of the Governor's staff, but elected by the people for the same term as other state officers are elected. In Texas he is a member of the Governor's staff, and is appointed by him as Commander in Chief, by and with the advice and consent of the Senate, if in session, for a term of two years. In Vermont he is elected by the General Assembly. In Washington he is elected by the field and line officers for a term of four years, and in Wisconsin he is made the chief of the Governor's staff, and no term is prescribed.

It will be seen that, if the contention of relator, that his term continues for life or until removed by court-martial be sound, a most radical departure is made in North Dakota from the statutory regulations in the other states and territories. I cannot believe that the Constitution and laws of this state are susceptible of any such construction as that contended for by relator's counsel. Section 192, supra, has reference clearly to those officers of the militia only who belong to the field or line, or, in other words, who are known as field or line officers, and to whom commissions have been issued conferring a certain rank upon them, as, for instance, brigadier general, colonel, lieutenant colonel, major, or captain. These ranks are their offices to which they have been commissioned, and from which they cannot be removed except by court-martial. The Adjutant General, as such, is not a commissioned officer within the meaning of those words as used in the Constitution. He is merely a staff officer. It is true he must me selected, appointed, or detailed from the officers of the field or line, i. e., from the commissioned officers. It is true that the person who is detailed or appointed as Adjutant General is, while in such department, clothed with the rank of brigadier general, but this does not mean that the Adjutant General, as such, is a commissioned officer. Can it be possible that the framers of the Constitution intended that staff officers should have a life tenure? In other words, that each Governor cannot, as Commander in Chief, select his own staff officers? Most clearly not. Staff officers are appointed or detailed for duty by the commanding officer, and it is, to my mind, perfectly apparent that, when there is a change in the commanding officer, the new commanding officer may select and detail his staff officers. Section 1747, Rev. Codes 1905, provides: "Commanding officers of regiments or battalions shall detail their staff officers from the officers or enlisted men of their command, and appoint the noncommissioned officers of the organization by warrants. Staff officers so detailed (not commissioned) will be dropped from the company rolls and the vacancy filled by promotion or appointment." A commissioned officer who has been appointed or detailed to one of these departments may be removed or retired therefrom at the pleasure of the Commander in Chief, the same as such an officer may be removed or retired from his command; and such removal or retirement is not a removal from office within the meaning of section 192 of the Constitution aforesaid. He retains his rank on

which he is retired, and this is the office to which he is commissioned, and from which he cannot be removed except by court-martial.

As said by the New Jersey court in Grove v. Mott, 46 N. J. Law, 328, 50 Am. Rep. 424: "The argument that the section of the act under which Major General Mott placed the officers of the disbanded company on the retired list is in conflict with the Constitution of the state is fallacious. It is contended that it violates article 7, § 1, par. 6, which forbids the removal from office of commissioned officers of the militia, except through sentence of a court-martial. The answer is that the officers of the disbanded company have not been removed from office. The framers of the national guard act knew the difference between taking away an officer's commission and placing him on the retired list. By placing Capt. Grove and the other officers of the company on the retired list, the division commander kept within constitutional requirement, and did not only what the Constitution permitted and the law authorized, but pursued a course sanctioned by long military usage." At another place in the opinion it is said: "The officers placed on the retired list still hold their commissions, and may be assigned to military duty by their superior officer. They are still carried on the register, hold the rank upon which they were retired, and are entitled to wear the uniform of said rank. In fact, none of their personal rights or property interests have been invaded." In this connection see section 1797, Rev. Codes 1905.

In People v. Ewen, 17 How. Prac. (N. Y.) 375, the same doctrine is announced. The court there held that an order disbanding or consolidating corps does not deprive an officer belonging to a disbanded company of his commission, nor take from him any privilege contrary to the Constitution. We quote: "Section 5 provides that 'no commissioned officer shall be removed from office unless by * * * the decision of a court-martial pursuant to law.' By the consolidation of the regiments in question the relator is not deprived of office. * * * To be sure, the relator will become a supernumerary lieutenant-colonel, but that only deprives him of present command; it does not deprive him of office; and this is all that is prohibited by the Constitution." To the same effect, see People v. Hill, 126 N. Y. 497, 27 N.E. 789; State v. Jelks, 138 Ala. 115, 35 South, 60, and 1 Winthrop Military Law, p. 607.

To make my views clearly understood, section 192 should receive the same construction as though it read, "No line or field officer of the grade of brigadier-general, colonel, lieutenant-colonel, major, captain, etc. (being the commissioned officers), shall be deprived of the title or grade to which he has been commissioned, except by court-martial, pursuant to law."

If the foregoing views are sound, and I think they are, then the Governor, as Commander in Chief, had a legal right to remove the relator at will and appoint another person in his place. This was done, and hence relator has no legal claim to the office, and the writ should be denied.

MORGAN, C. J. (dissenting). I am unable to agree with the conclusion reached by my associates that the writ should not be issued in this case. I agree with Judge FISK that sections 2 and 3 of chapter 136, page 244, Laws of 1905, are unconstitutional as not in compliance with the provisions of section 61 of the Constitution. The title of that act does not relate in a general way to appointments to offices, and it expresses only from what source particular appointments are to be made. The title does not express anything in regard to the tenure of the appointments, nor is the tenure of such appointments germane to the restricted subject expressed in the title. No one could infer from the reading of this title that the tenure of the appointments mentioned therein was limited in the body of the act, nor that it provides for the promotion or retirement of officers of the militia or National Guard.

The ground upon which I am forced to disagree with my associates is that section 192 of the Constitution is not given effect by them, nor do they suggest any sound reason for sustaining their conclusion that it has no application. My opinion is that section 192 applies to all commissioned officers of the militia or national guard of this state, and that the relator is a commissioned officer thereof, and holds that office during good behavior, or until removed by court-martial, or until he resigns, or the Legislature, by a valid act, limits the term of his incumbency of office. If it is against the principles of republican governments to tolerate life tenures in office, civil or military, the Legislature is the proper body to remedy or change what has been an accepted construction of the law and Constitution as to the tenure of the office, to wit, that it is to be held during good behavior. In other words, this office is held under the same tenure that all commissioned officers of the militia

of a strictly military character are held. I have no quarrel with the doctrine announced in some of, the concurring opinions of my associates that appointees to offices not having a fixed tenure are removable at the pleasure of the Governor or Commander in Chief. But I do most emphatically disagree with the doctrine that such is the case as to officers included within section 192 of the Constitution, which says that: "The commissioned officers of the militia shall be commissioned by the Governor, and no commissioned officer shall be removed from office except by sentence of court-martial, pursuant to law." I agree with the principles laid down in the cases cited in the concurring opinions (Grove v. Mott, 46 N. J. Law, 328, 50 Am. Rep. 424; People v. Hill, 126 N. Y. 497, 27 N. E. 789; People v. Ewen, 17 How. Prac. [N. Y.] 375), and other cases of similar import. But in my opinion they have no pertinency here, and some of them are expressly based on local statutes. These cases simply hold that no removals were made of the officers complaining, but that they were removed from command merely. In other words, they became supernumeraries as defined by the New York statute, and had no command thereafter. People v. Scrugham, 25 Barb. 216. If it could be shown in this case that the relator has not been removed from the office of Adjutant General of this state, I would concur in denying the use of the writ of quo warranto. But I do not think it is any answer to the contention that he has not been removed to say that he still holds some other military office or title. The fallacy in the contention that he has not been removed lies in attempting to maintain that the Adjutant General is not a commissioned officer. The statute, both state and federal, provides for the appointment of an Adjutant General. The state and federal statutes provide what his duties shall be in reference to the state militia or national guard. We thus have an appointee whose appointment is made obligatory by state and federal law, and his duties are laid down unequivocally by state and federal law. These duties pertain almost exclusively to the state militia and national guard. The state law which provides for the organization of the state militia makes him a component part of the state militia, and provides for his salary and duties. The Governor of the state must appoint some one to that office, and the Constitution provides that all officers of the militia shall be commissioned by the Governor, and the relator was commissioned by the Governor of the state. Under these circumstances, I do not understand how it can be suc-

cessfully maintained that he is not a commissioned officer of the militia within the meaning of section 192. An office is generally defined as a public charge or employment through which the incumbent discharges a part of the functions of government for the benefit of the public. I fail to find any statute or practice or custom in this state authorizing or providing that the Adjutant General shall be a staff officer of the Governor or his military secretary. As I understand it, the personal staff officers of the Governor in this state are not deemed to be members or parts of the militia, and are not included within section 1718, which provides what the National Guard of the state shall be composed of. Under the regulations or laws governing the regular army, it is asserted and undoubtedly true that adjutants of regiments or adjutants general of brigades are, or may be, staff officers of the commanding officers, being detailed from the various officers of the regiment or brigade by orders and not commissioned as such. But it does not seem to me that this fact has anything to do with the question under consideration in this case as to the commissioning and tenure of office of the Adjutant General. The contention is made that section 1774, Rev. Codes 1905, is conclusive upon the question as to whether the Adjutant General is a commissioned officer or is merely a detailed staff officer of the Governor. I do not understand that said section does anything more than to provide the compensation for the officers and enlisted men when called out as a regiment or brigade for active service. This section does not mention an Adjutant General, as his compensation is fixed by section 1737 of the Code. I think the words "staff officers" as used in section 1774 refer entirely to the staff officers of the commanding officers of the regiment or brigade. The words "staff officer" as used in that section have the same meaning and refer to the same officers as the officers referred to under section 1747 of the same Code, and in neither section do they refer to the Governor's staff. As a matter of fact, the duties of the Adjutant General in this state are almost exclusively independent of the Governor, except that the Governor is the superior officer as Commander in Chief. I do not find any reasonable basis for the contention that the relator has not been removed from the office of Adjutant General, but has simply been relieved from the duties. The basis of the contention that he has not been removed is that the office and duties of Adjutant General are simply incidental to some other office, and that he is detailed from such other office

to perform the duties of Adjutant General. This means that the relator performed the duties of Adjutant General by virtue of being brigadier general or some other commissioned officer. I do not so understand the statute relating to the appointment and duties of Adjutant General. The relator was not appointed to the military office of brigadier general, nor has he ever held that office so far as the record shows. The office to which he was appointed or commissioned is that of Adjutant General, and that commission or appointment carried with it, as a matter of law, the rank of brigadier general. He had no right and could not perform any duties by virtue of the rank of brigadier general thus conferred upon him. To say that he has not been removed from this office when another commission has been made to it, and the new appointee is performing the duties of the office is an assertion not warranted by the facts, it seems to me. The office which the relator held in the militia prior to his commission to that of Adjutant General has now been filled by another, and the relator cannot be returned to that office. When an officer is detailed to perform the duties of another office he retains his old office and title, and when the detail is at an end he returns to his former office. The cases cited to the effect that the office remains in the incumbent although the command is taken away from him are not in point, and they seem to have been based on local statutes. It will not be denied by me that the Commander in Chief may, under certain circumstances, detail some other officer from the militia to perform the duties of Adjutant General. It is sufficient for the purposes of this case to say that the appointment of the relator was not such a detail, but was an unconditional appointment under a commission. Prior to the enactment of chapter 136, p. 244, of the Laws of 1905, there was no provision of law in this state requiring Adjutants General to be appointed from the National Guard. In the case of such an appointment, can it be contended that the Adjutant General could be removed summarily without court-martial by the Governor? If so, what position or office or title in the militia would he retain thereafter, on the theory that his appointment was simply a detail? It is contended that under section 1719, Rev. Codes 1905, providing that the Governor has "full power to appoint the Adjutant General," the power is conferred upon the Governor to remove an Adjutant General at his will. If it conferred that power upon the Governor, it is not expressed in that section. To say that

this section confers the power of removal is adding materially to its provisions. The power of removal should not be implied, but should be directly authorized, and it is not contended that any statute in this state expressly authorizes removals in such case as the one now under consideration. It is worthy of notice that section 192 of the Constitution has always been deemed to include the office of Adjutant General in this state, and this office has always been held under the same tenure as the strictly military offices of the regiment, from that of colonel to second lieutenant. No appointments to the office have been made except to fill vacancies. It has been conceded with practical unanimity that the tenure of the office has been during good behavior until the enactment of chapter 136, p. 244, of the Laws of 1905. I think the fact of such construction of the provisions of the law and Constitution since the organization of the militia in this state is entitled to weight as showing that the tenure is not limited in the absence of statute. If the Adjutant General holds during the pleasure of the Governor, why was it deemed necessary to pass chapter 136, p. 244, of the Laws of 1905? I think more weight should be attached to the construction given by the Legislature of 1905 and by the state militia officers and Governors since the organization of the militia to the constitutional and statutory provisions in regard to the office of Adjutant General and the tenure thereof than to the fact that the laws and Constitutions of some other states limit the tenure of that office. The question as to what the tenure of that office is, is to be determined by this court as a question of law, and not as a question of policy. Whether it is a good or a bad policy to limit the tenure of the office of Adjutant General is a question for the Legislature of this state, and what the people or Legislatures of other states consider to be sound policy is not a matter for this court, and should have no bearing as to what construction is to be given to these constitutional and statutory provisions. Tenure of office during good behavior seems to be the accepted policy in this state, and everywhere, so far as I know, as to the commissioned officers of the militia. I think that there is no danger of injury to the National Guard through the tenure of office during good behavior of the Adjutant General, subject to court-martial for violation of duty, than through uncurbed power vested in a Governor or Commander in Chief. It seems to be conceded by all parties that the Legislature has full constitutional authority to enact a law

limiting the tenure of Adjutant General's office. Such authority is granted by section 191 of the Constitution, which is as follows: "All militia officers shall be appointed or elected in such manner as the Legislative Assembly shall provide;" and there is no basis for the contention that the enactment of such a law would be repugnant to section 192. That section relates only to the powers of the Governor. Section 191 is an express authorization for the Legislature to provide for the appointment or election of all militia officers, and this language is broad enough to authorize a law relating to removals by the appointment of successors to all officers of the militia, where the tenure is not fixed. It is by virtue of section 189 of the Constitution that section 1731, Rev. Codes 1905, relating to disbandment and consolidation of companies, was enacted. People v. Hill, supra. There is no similar section pertaining to the removal of Adjutants General. Hence section 192 of the Constitution is controlling against the power of the Governor to peremptorily remove him. In section 1719, Rev. Codes 1905, the same language is used in reference to the appointment of Adjutants General as is used in reference to the appointment of brigadier generals, and section 1720 of the Code provides that all commissions shall be issued by the Governor, and that no commissioned officer shall be removed except by sentence of court-martial. It will not be contended that a brigadier general could be summarily removed by the Governor. If he could not remove a brigadier general, why should a different rule apply to an Adjutant General, who is an officer of the militia by state and federal law, and appointed and commissioned by the Governor the same as a Brigadier Genreal would have to be? It is claimed that Blake v. U. S., 103 U. S. 462, 26 L. Ed. 462, is decisive of the question that an Adjutant General may be removed without court-martial where the tenure of his office is not fixed by law, but I do not so understand that decision. The section of the United States statute similar to our section 192 of the Constitution was under consideration, and. it was held by that court, in view of the statutes which were repealed at the same time that the section under consideration was enacted, and in view of the political conditions and reasons that induced the enactment of that statute, it referred to removals by the President alone, and not to removals by the President with the consent and concurrence of the Senate. The language of the section construed in that case was held susceptible of two constructions, and

for reasons given in the opinion the court held that the intention of Congress was to prevent removals by the President alone. It is not an authority on the question whether the appointing power can remove an officer of the militia of this state not holding under a fixed tenure in violation of section 192 of the Constitution. In that case, the intention of Congress was gathered from past history and prevailing conditions. In this case the language of the statute and Constitution is not equivocal, and can be construed without resort to historical events, and when past history is considered it shows that the construction contended for by the respondent has been repudiated.

For these reasons I am of the opinion that the writ of quo warranto should be issued, and I therefore respectfully dissent from all the conclusions reached by my Brethren.